UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ORLANDO JOHNQUIL MCCRAE,

        Plaintiff,

    v.

COREY LARNED, SCOTT DIEHL,
ALEXANDRIA CHEREMNOV, and
LOGAN BURGER,

        Defendants.

_____

Case No. 6:20-cv-2180-MK

FINDINGS AND
RECOMMENDATION

KASUBHAI, Magistrate Judge.

    *Pro se* plaintiff Orlando Johnquil McCrae brings this action against Deputy Corey

Larned, Deputy Scott Diehl, Deputy Alexandria Cheremnov (collectively "defendants"), alleging

violations of the Fourth Amendment and asserting claims of excessive force and failure to

intervene.[1] Compl., ECF No. 2. Before the court is defendants' Motion for Summary Judgment.

---

[1] Plaintiff also asserts a claim of excessive force against Oregon State Police Trooper Logan
Burger who has not yet been served in this action and who has not yet appeared.

ECF No. 18. For the reasons set forth below, defendants' motion (ECF No. 18) should be GRANTED.

## BACKGROUND

This case arises out of the arrest of plaintiff on multiple charges on September 13, 2020. Plaintiff presents an extensive account of his interactions with defendants on that date in his Declaration [in support of] Plaintiff's Response to Deputy Defendants' Reply to Plaintiff's Supplemental Response to Defendants' Motion for Summary Judgment ("Pl.'s Decl."), *see* ECF 50, and in his Brief in Opposition to Defendants' Summary Judgment Motion ("Br. Opp."). *See* ECF 51. Plaintiff's account of defendants' efforts to arrest him closely parallels the statement of facts in defendants' Motion for Summary Judgment ("Mot."). *See* ECF 18. In fact, significant sections of plaintiff's account repeat, verbatim, defendants' version of events. The material facts in defendants' detailed account are confirmed by evidence in the record, including the Marion County Probable Cause Statement and Marion County Sheriff's Office ("MCSO") Incident Report—both of which were filed by plaintiff. *See* Compl. Ex. A at 2-9, ECF 6. The following facts are therefore undisputed unless otherwise noted.

On September 13, 2020, Deputy Larned, a deputy with the Marion County Sheriff's Office ("MCSO") was on duty and driving a marked patrol vehicle when he responded to a dispatch reporting a complaint of a Dodge minivan swerving in and out of traffic. Larned Decl. ¶¶ 4-5, ECF 20. The vehicle was last seen pulling into the driveway of 6066 Turner Road SE in Salem, Oregon*,* and the complainant described the van as having a broken rear window and dragging a rear bumper. *Id*. at ¶ 5, ECF 20*.* Deputy Larned knew the property as "not law enforcement friendly" and asked MCSO Deputy Diehl to respond with him. *Id.*

At 5:36 p.m., Deputy Larned arrived at 6066 Turner Road SE, a property with several acres, a house and barn/shop at the end of long gravel driveway surrounded by trees and fields. *Id.* When Deputy Larned arrived, he could see a silver Dodge minivan parked in the driveway of the property. *Id*. Deputy Larned used his binoculars to read the vehicle's license plate, but it was too far away to read. *Id.* at ¶ 6. Deputy Larned saw two males walking near the minivan—one was later identified as plaintiff in this action, and the second male was never identified. *Id.* Deputy Larned, who was wearing his department issued uniform and displaying his badge, got out of his patrol car, waved to the two men, walked toward them, and asked, "can I come talk to you?" *Id.* at ¶ 7. When the second male waved for Deputy Larned to walk down to them, he did so and explained the reason for his contact. Pl.'s Decl. ¶ 7, ECF 50; Larned Decl. ¶ 7, ECF 20. Once Deputy Larned was close enough to see the license plate on the minivan, he called MCSO dispatch to provide the license plate number. *Id.* Deputy Diehl arrived on the scene and joined Deputy Larned in the driveway. *Id* at ¶ 8.

Deputy Larned and Deputy Diehl stood in the driveway, and plaintiff and the unidentified male stood near the front door of the house. *Id*. Deputy Larned described plaintiff as wearing a long-sleeved jacket that was unzipped and had front pocket that were "weighed down with heavier objects" that Deputy Larned could not identify. *Id*. A third male later identified as the homeowner, Vincent Warmack, came out of the house and asked what was going on. *Id.* at ¶ 9. Deputy Larned explained that he was responding to a driving complaint about the minivan and asked if the driver were still on the property. *Id.* Deputy Larned did not get a clear response from the men and sensed that they were providing a false name, so he inquired further until plaintiff finally identified himself as the driver. *Id*; *see* Compl. 3, ECF 2 (in which plaintiff states, "[a]fter

intense questioning, I eventually gave my name to prevent unwanted attention to my family's residence"). After plaintiff gave his name, he started to walk away from Deputy Larned. *Id.*

Deputy Larned gave plaintiff's name and date of birth to MCSO dispatch. Compl. Ex. A at 6, ECF 6. Dispatch responded that plaintiff had a Failure to Appear warrant for Assault with "cautions" for weapons possession.[2] *Id.*; Larned Decl. ¶ 11, ECF 20. Deputy Larned "called after plaintiff stating he needed to come back because he had a warrant" but plaintiff continued to walk away and ignored Deputy Larned's commands. Pl.'s Decl. ¶ 11, ECF 50; Larned Decl. ¶ 11, ECF 20. As plaintiff moved behind the house and out of sight, Deputy Larned did not pursue him because he did not know what was behind the house and because plaintiff had a warrant for a violent offense with a caution for weapons and had not been patted down for weapons. *Id.* at ¶ 12. Instead, Deputy Larned updated dispatch and requested additional officers to respond. *Id.* Salem Police then radioed Deputy Larned that they had probable cause to arrest plaintiff for Assault in the Second Degree. *Id.* at ¶ 13.

After plaintiff walked out of sight, Deputy Larned and Deputy Diehl positioned themselves on the southern corners of the house where they could see if plaintiff tried to run into the trees. *Id.* When plaintiff came into Deputy Larned's sight on the west side of the house, Deputy Larned addressed plaintiff calmly and with clear instructions, telling him again that there was a warrant for his arrest and he was not free to leave. *Id*; Pl.'s Decl. ¶ 12, ECF 50. Plaintiff states that he "argued that the warrant was not real unless deputies immediately provided him

---

[2] Under O.R.S. § 163.175(1), "[a] person commits the crime of assault in the second degree if the person: (a) Intentionally or knowingly causes serious physical injury to another; (b) Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon; or (c) Recklessly causes serious physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." Assault in the second degree is a Class B felony. OR. REV. STAT. § 163.175(2).

with a copy." *Id.* at ¶ 13. Defendants similarly describe plaintiff as contesting the warrant and demanding, "show me a copy now!" and, "get your boss here now!" Larned Decl. ¶ 14, ECF 20.

When plaintiff made his way to the front door Deputy Larned told him he was not was not free to or and told him not to go inside the house. *Id.* at ¶ 15. Plaintiff says he then "attempted to flee by running into the resident home." Opp. Br. at 2, ECF 51. More specifically, plaintiff says that he ignored Deputy Larned and "began reaching to go inside, which Deputy Larned told him he was not allowed to do." Pl.'s Decl. ¶ 14, ECF 50. When plaintiff continued to disregard Deputy Larned and "reached to open the screen door to go inside," Deputy Larned "then told plaintiff that he was now 'under arrest' and reach-grabbed ahold of plaintiff's right wrist." *Id.* at ¶ 15. Plaintiff "began pulling away, drawing Deputy Larned into the house" and "continued running into the house, causing the screen door to close on the deputy's arm and pinch his left wrist due to the fact he held onto plaintiff as the door was closing." *Id.* at ¶¶ 15-16. Eventually, Deputy Larned "was forced to let go of Plaintiff's wrist." *Id.* at ¶ 16. Deputy Larned looked down at his left wrist, saw that it was bleeding, and felt a burning sensation from the top layer of missing skin. Larned Decl. ¶ 16, ECF 20.

Deputy Larned remained outside the house, updated his dispatch, and requested more officers and a canine unit. *Id.* at ¶ 17. Deputy Larned retreated and took cover near a stack of wooden pallets where he could see the east side of the house, and he told Deputy Diehl to retreat from the front door and find cover. *Id.* The homeowner, Vincent Warmack, who had overheard Deputy Larned's radio call for canine back up, emerged from the house "aggressively yelling" at Deputy Larned that no dog would be brought to his property or into his house while pointing his finger at Deputy Larned and walking toward him. *Id.* at ¶ 18. Warmack told Deputy Larned to get plaintiff out of the house himself, and Deputy Larned told him he would not do so. *Id.*

Deputy Larned ordered Warmack to back away and told him not to re-enter the house. *Id.*
Warmack said his wife was in the house, ignored Deputy Larned commands, and eventually
went back inside. *Id.* Deputy Larned heard yelling inside the house for several minutes and
thought Warmack was yelling at plaintiff to get out of the house. *Id.* Plaintiff describes these
events in a similar way and explains that the homeowner (whom plaintiff refers to as,
"Womack") came inside and "demanded Plaintiff to exit the house so that no dogs will be sent in
after him." Pl.'s Decl. ¶ 19, ECF 50.

Plaintiff says he "immediately complied" with Warmack's demand and exited the house
on the east side where both deputies could see him. *Id.* at ¶ 20. Plaintiff also says that he stepped
out of the house with "both hands in [the] air to show that he was not armed or intended to cause
any danger to anyone," and began walking toward his van without saying anything. *Id.* Deputy
Larned began giving plaintiff clear commands to "get down," but plaintiff continued walking
toward Deputy Larned and the minivan without acknowledging Deputy Larned. Larned Decl.
¶ 19, ECF 20. Deputy Larned "continued making demands for Plaintiff to 'get down,' 'get on
your stomach,' and 'stop,' but plaintiff would not stop walking toward the van, which Deputy
Larned was using for cover." Pl.'s Decl. ¶ 21, ECF 50. Plaintiff says he "kept his hands raised as
he approached the passenger side door of the minivan, but did not comply with any of the
deputy's commands." *Id.* at ¶ 22.

Deputy Larned had been holding his handgun at low ready. Larned Decl. ¶ 20, ECF 20.
As plaintiff got closer to Deputy Larned and the minivan, "Deputy Larned began pointing his
gun directly at Plaintiff as he repeated commands for Plaintiff to stop advancing and get down."
Pl.'s Decl. ¶ 23, ECF 50. Plaintiff continued to ignore Deputy Larned and tried to open the
passenger side door of his van while Deputy Larned commanded him, "'don't reach in the van or

I will shoot you,' and 'get down on your stomach.'" *Id.* at ¶ 24. Plaintiff, "[i]gnoring the commands, . . . began reaching in the rolled down window as if to unlock the door, but began slowly stepping away when the door would not open." *Id*. While plaintiff attempted to open the passenger side door, he continued to say nothing. Larned Decl. ¶ 20, ECF 20.

After plaintiff was unable to open the passenger door, he turned to look away from Deputy Larned and towards Deputy Diehl, who was about 80 feet away. *Id.* at ¶ 25. Plaintiff says that he "turned around, hands still in the air and began walking quickly back toward the house as if to flee from officers." Br. Opp. 2, ECF 51. As plaintiff walked toward the house, Deputy Larned holstered his handgun and drew his Taser. Larned Decl. ¶ 21, ECF 20. Plaintiff "then began to make a quick movement as if to start running toward the front door of the house." Pl.'s Decl. ¶ 26, ECF 50. As to what next happened, Deputy Larned, states:

> At that time, I believed probable cause existed for [plaintiff] causing injury to me while fleeing, that [plaintiff] had an active assault arrest warrant, and that Salem Police reported they had probable cause for arresting [plaintiff] for Assault in the Second Degree. I believed [plaintiff] would continue his efforts to avoid capture by going back inside the house or running away from me.

Larned Decl. ¶ 22, ECF 20. Deputy Larned ran up to within about 15 feet of plaintiff and deployed his taser at the center of his back. *Id.* at ¶ 23. The taser was only "partially effective" so Deputy Larned ran towards plaintiff and "attempted to half-tackle and reach his right arm over the plaintiff's right shoulder and his left arm under his left armpit." Pl.'s Decl. ¶ 28, ECF 50. As soon as Deputy Larned got a "partial grip," plaintiff "quickly moved his upper body forward" which sent Deputy Larned "over plaintiff's shoulder." *Id.* at ¶ 29. They "both fell to the ground, with Deputy Larned landing on the left side of his face, and plaintiff falling on top of Deputy Larned." *Id.*; Larned Decl. ¶ 23.

7  -  FINDINGS AND RECOMMENDATION

After Deputy Larned tased plaintiff and attempted to restrain and handcuff him, other

responding officers arrived, including defendant Deputy Cheremnov. While Deputy Larned

struggled to restrain plaintiff and handcuff him, plaintiff says that he "tried to escape the

defendants' grasps in an attempt to flee and avoid being taken into custody." Br. Opp. 3, ECF 5.

Plaintiff describes the situation on the ground in more detail as follows:

> Deputy [Larned] attempted to get control of Plaintiff's wrists and arms as Plaintiff
> began to slip Larned's grip in an attempt to get away and get up. Deputy Larned
> continued commands for Plaintiff to "stop" and "put your hands behind your
> back" as plaintiff struggled to break free.
>
> Plaintiff was then taken to the ground and piled on top of by several other officers
> now on scene.
>
> Deputy Larned continued yelling commands to Plaintiff and asked other deputies
> to grab Plaintiff's free right arm. Nobody was able to restrain Plaintiff for several
> minutes as Deputy Larned had plaintiff's armpit under under his right knee with
> all of his, Deputy Diehl and Burger and Cheremnov's weight on his legs and
> torso, all fighting to get a hold of his limbs, to the point of Plaintiff being unable
> to breathe and having to fight just to take in air, constantly yelling, "I can't
> breathe! I can't breathe!"
>
> Deputy Larned then began beating Plaintiff with closed fists as he described as
> "closed fist focus blows", landing them on plaintiff's left side. At this point,
> plaintiff felt his life was in imminent danger and continued to try to break free and
> yell, "I can't breathe! I can't breathe"
>
> Once Plaintiff was secured in handcuffs, another deputy let Deputy Larned know
> that he could now move away from Plaintiff.

Pl.'s Decl. ¶¶ 30-33, ECF 50.

Deputy Cheremnov was not able to handcuff plaintiff, but other officers were eventually

able to secure plaintiff in handcuffs and gave Deputy Larned commands to move away. *Id.*;

Larned Decl. ¶ 28, ECF 20. Deputy Larned could not stand for a moment, held his left eye closed

from the pressure of the hit, and was out of breath. *Id.* He checked himself over and felt his lower

left arm was number and found a red, swollen bump on his left forehead, as well as scratches on

his left elbow and left wrist. *Id.* Due to complaints of dizziness, partial loss of vision in his left eye, and a tingly sensation in his left arm and fingers, Deputy Larned was transported to Salem Hospital via ambulance. Compl. Ex. A at 2, ECF 6. Deputy Diehl had three small cuts to his right forearm and a small abrasion to his left forearm. *Id.* Trooper Burger had two small lacerations on his right hand and thumb, and Deputy Cheremnov suffered two bruises on her right elbow that were purple and red and about an inch in size. *Id.* at 2-3.

Once plaintiff was placed inside a deputy's vehicle, he began kicking the backseat passenger side door and ignored the officers' commands to stop. *Id.* at 2. Plaintiff kicking the back door caused the sealed trim on the passenger door to pop out, and the back door was no longer flush with the other paneling on the vehicle. *Id.*

On December 10, 2020, a Marion County jury found plaintiff guilty of the following crimes: (1) resisting arrest; (2) interfering with a peace officer; (3) criminal mischief in the second degree (for damaging the door of the deputy's vehicle); and (4) assault in the second degree constituting domestic violence. Glaccum Decl. Ex. B at 30, ECF 19 (verdict form from *State v. McCrae*, No. 20CR50283). The same jury acquitted plaintiff of four counts of assaulting a public safety officer. *Id.* at 29-30.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may

only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is submitted, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

*Pro se* adults in custody are exempted "from strict compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (emphasis in original) (citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013)) ("[W]e do not entirely release [the *pro se* adult in custody plaintiff] from any obligation to identify or submit some competent evidence [in opposing a summary judgment motion]."). In opposing a motion for summary judgment, a *pro se* adult in custody must still submit evidence, such as a "declaration, affidavit, authenticated document, or other competent evidence," to support his or her allegations or to dispute the moving party's allegations. *Id*.

## DISCUSSION

Defendants argue they are entitled to summary judgment because no reasonable jury could find that they used more force than was necessary to arrest plaintiff or that Deputy Cheremnov had a duty to intervene. Mot. 12, ECF 18. Plaintiff argues that the court should deny

defendants' motion because there are genuine issues of material as to whether Deputy Larned applied force "in an effort to cause harm," and whether plaintiff was "assaultive, dangerous, or threatening by trying to escape/flee." [3] Pl.'s Statement of Disputed Factual Issues at 1-2, ECF 52. *Id.* These arguments are discussed in turn below.

## I.    Excessive Force Claim

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures."[4] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Under the Fourth Amendment, "police officers are not required to use the least amount of force necessary to arrest a suspect." *Moore v. City of Boise*, No. 1:16-CV-00346-BLW, 2018 WL 1474060, at *14 (D. Idaho Mar. 26, 2018), *aff'd*, 829 F. App'x 810 (9th Cir. 2020) (citing *Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010)). Rather, officers are required to use an amount of force that is "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation marks omitted); *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 397). The objective reasonableness inquiry requires "balancing the

---

[3] In his Supplemental Response to defendants' Motion for Summary Judgment, plaintiff also argues that defendants failed to comply with his "numerous discovery requests for the body cam footage of Deputies Larned and Diehl." ECF 42. In response, defendants argue, and the court agrees, that "[d]efendants provided the copies of the two videos of the incident in response to Plaintiff's Discovery Request,'" and "mailed timely responses to all discovery requests made[.]" Reply 6, ECF 39. Because the court is not aware that any evidence was withheld during Discovery or that plaintiff has suffered any disadvantage because of defendants' Discovery responses, this issue has no bearing on defendants' Motion for Summary Judgment.

[4] In the Complaint, plaintiff identifies the "4th, 5th, 8th, and 14th Amendment[s]" as the rights at issue, but he only alleges facts that could support a claim of excessive force under the Fourth Amendment. Plaintiff does not explain what rights were allegedly violated under the other constitutional provisions cited, and none are apparent. Defendants are therefore entitled to summary judgment on those unspecified claims.

nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053-54 (9th Cir. 2007) (internal quotation marks omitted). "In assessing the objective reasonableness of a particular use of force, [courts] consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc) (quoting *Glenn*, 673 F.3d at 871)). Courts may also consider "the availability of alternative methods of capturing or subduing a suspect." *Davis*, 478 F.3d at 1054.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes v. City of Portland*, No. 3:18-CV-00988-AC, 2020 WL 1154762, at *4 (D. Or. Mar. 10, 2020) (citing *Graham*, 490 U.S. at 396). However, "the facts and circumstances of every excessive force case will vary widely." *Forrester v. City of San Diego*, 25 F.3d 804, 806 n.2 (9th Cir. 1994) (quotation marks omitted). The court must therefore "decide on a case by case basis whether the totality of the circumstances justifies the force used as judged from the perspective of a reasonable officer at the scene." *Sjogren v. City of Seaside*, No. 05-CV-1478-ST, 2007 WL 221869, at *9 (D. Or. Jan. 19, 2007) (citing *Graham*, 490 U.S. at 396) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

A.    **The type and amount of force used**

Regarding the type and amount of force used to arrest plaintiff, the parties agree that, at a minimum, Deputy Larned deployed his taser at plaintiff's lower back and directed one to two

punches or 'focus blows' to plaintiff's side. The evidence shows that plaintiff was hit by one taser probe and that Deputy Larned attempted to "drive stun" plaintiff as they struggled on the ground but was unable to gain sufficient control of his taser gun to do so. *See* Larned Decl. ¶¶ 24-25, ECF 20; Compl. Ex. A at 8, ECF 6. Plaintiff also alleges that defendants had "all of [their] . . . weight on [plaintiff's] legs and torso, all fighting to get ahold of his limbs to the point of plaintiff being unable to breathe . . . and constantly yelling 'I can't breathe! I can't breathe!'" Pl.'s Decl. 8, ECF 50. Plaintiff does not allege that he suffered additional harm or injury from defendants and there is no evidence that plaintiff complained of ongoing respiratory distress following his arrest or that he sought or received medical care. In fact, plaintiff contends that he was "transported to the Marion County jail without further incident" following his arrest. Physical injuries are not necessary to make out a Fourth Amendment violation, but they are "certainly relevant in evaluating the degree of the Fourth Amendment intrusion." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010).

Based on a review of Ninth Circuit caselaw, the court finds that defendants used a significant or intermediate level of force in their efforts to arrest plaintiff. Starting with Deputy Larned tasering plaintiff, the court acknowledges the lack of injury alleged by plaintiff and his contention that the taser "did not have its full effect." *See* Br. Opp. 2, ECF 51. While this might indicate the taser did not have substantial impact, the Ninth Circuit and other circuits recognize a taser shot "as a 'painful and frightening blow,'" and as "a greater level of intrusion than other non-lethal methods of force." *Bryan*, 630 F.3d at 826 (citing cases). In assessing the level of force used, "[t]he conduct need not have actually caused serious injury[.]" *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016). Rather, "it is the risk of that result that turns the screw." *Id.* Therefore, a taser, "used in dart-mode"—as Deputy Larned used here—

"constitute[s] an intermediate, significant level of force[.]" *Id.* at 826 (citations omitted); *see also, Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (describing the officer's use of a taser as an "intermediate" level of force and "something less than deadly").

Deputy Larned's use of punches or focus blows also constituted significant force. *See Boyd v. Cnty. of Riverside*, No. EDCV1301282JVSDTB, 2016 WL 11755423, at *14 (C.D. Cal. Sept. 7, 2016), *report and recommendation adopted sub nom. Boyd v. Riverside*, 2016 WL 11755592 (C.D. Cal. Oct. 27, 2016) ("punches and knee strikes are a significant use of force"). Plaintiff describes Deputy Larned as "beating [him] with closed fists," Pl.'s Decl. 8, and claims that the blows caused him "extreme pain in his chest and rib cage." Br. Opp. 3, ECF 51. Deputy Larned concedes that he "tried to punch [plaintiff's] lower left rib case with a closed fist," but says that his attempts to punch him "had no effect in stopping [plaintiff] from fighting" because he was "still mostly under [plaintiff], on my back, with [plaintiff] facing away from me and almost sitting on my left chest." Larned Decl. ¶ 25, ECF 20. Deputy Larned's account suggests that his punches did not involve a great deal of force. However, on a party's motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and "accept the version of all disputed facts most favorable to him." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 n.1 (9th Cir. 2003) (citations omitted). Accepting as true plaintiff's description of Deputy Larned's blows, those punches, as described, were "'capable of inflicting significant pain and causing serious injury'" and therefore constituted "'significant force.'" *Garlick*, 167 F. Supp. 3d at 1147) (citing *Blakenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)); *see also Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) (the officer's use of a "closed fist and knee to deliver

multiple 'focused blows' to [the plaintiff's] head, shoulder, and side" constituted "significant" force).

The parties dispute whether defendants placed their weight on plaintiff as they struggled to arrest him. Plaintiff asserts in his sworn statement that defendants "piled on top" of his "legs and torso[.]" Pl.'s Decl. ¶ 32, ECF 50. In contrast, defendants' evidence describes Deputy Larned as mostly struggling to get *from underneath* plaintiff while they were on the ground and says that he used his right knee to pin down plaintiff's left armpit but did not otherwise apply weight against plaintiff. *See* Larned Decl. ¶ 25-26, ECF 20. Plaintiff also describes Deputy Larned pinning plaintiff's armpit with his right knee, which conflicts with his claim that Deputy Larned placed his full body weight on plaintiff. Thus, construing the evidence in the light most favorable to plaintiff, the court finds that defendants placed all or most of their weight on plaintiff's "legs and torso" while they struggled to "restrain plaintiff for several minutes." Pl.'s Decl. ¶ 32, ECF 50.

Ninth Circuit precedent recognizes that "law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual[] in an agitated state' can cause suffocation 'under the weight of restraining officers.'" *Garlick*, 167 F. Supp. 3d at 1155 (citing *Drummond*, 343 F.3d at 1056-67). In *Drummond*, the officers "pressed their weight against [the suspect's] torso and neck, crushing him against the ground[,]" *id*. at 1059, and they "maintained that pressure for a significant period of time"—about twenty minutes—despite the fact that the suspect was prone, handcuffed, "offered no resistance," and "repeatedly told the officers that he could not breathe and that they were choking him." *Id.* at 1054. Under those circumstances, the officers used "severe" or "lethal" force because it was "capable of causing death or serious injury." *See id.* at 1056; *see also, Garlick*, 167 F. Supp. 3d at 1155 ("[w]here officers apply approximately eight to

ten minutes of body-weight pressure to a suspect's back, under *Drummond*, [343 F.3d at 1056], the conduct as alleged constitutes lethal force").

 Here, it is significant that plaintiff yelled, "I can't breathe!" when defendants allegedly "piled on top" of him, yet it is difficult to characterize defendants' actions as "severe" or as "capable of causing death" because the entire incident lasted only several minutes at most and occurred while plaintiff was unhandcuffed and not otherwise restrained, and while he was trying "to escape the defendants' grasps in an attempt to flee and avoid being taken into custody." *See* Br. Opp. At 3, ECF 51. This is quite different from *Drummond* where officers applied their weight against the neck of "compliant, prone, and handcuffed individual," 343 F.3d at 1059, "who was offering no resistance." *Id.* at 1061. Even looking at the evidence most favorably to plaintiff, the record does not support a finding that defendants used lethal force against plaintiff. *See id.* Rather, when Deputy Larned and other deputies allegedly placed their weight on plaintiff, those actions constituted significant or substantial but non-lethal force because it was "non-trivial" and "capable of inflicting significant pain and causing significant injury." *Dominguez v. City of Scottsdale*, No. CV2100089PHXSRBMTM, 2022 WL 943726, at *6 (D. Ariz. Feb. 24, 2022); *Bryan*, 630 F.3d at 825 (defining lethal force as "force that creates a substantial risk of death or serious bodily injury").

 In sum, defendants' uses of force against plaintiff constituted significant force. "'Such force, though less than deadly, . . . is permissible only when a strong governmental interest compels the employment of such force.'" *Glenn*, 673 F.3d at 872 (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)); *see also, Perkins v. Roberts*, No. CV 06-954-SU, 2010 WL 5866231, at *9 (D. Or. Oct. 12, 2010), *report and recommendation adopted in part*, No. 06-CV-954-SU, 2011 WL 719593 (D. Or. Feb. 23, 2011) ("the deployment of chemical and

projectile munitions by the Pendleton Police against Perkins constituted a significant level of force that must be by justified by a strong government interest") (citing *Deorle*, 272 F.3d at 1280).

    **B.**       **The government interests at stake**

To determine whether the government had a sufficiently strong interest at stake to justify defendants' use of significant force, the court must analyze: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (citing *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

             **1.**       **The severity of the crime involved**

To start, the court considers the severity of the crime at issue. *Graham*, 490 U.S. at 396. Here, there is no genuine dispute that Deputy Larned and all responding deputies were aware that plaintiff had two warrants for assault throughout their interactions with plaintiff. While plaintiff argues that "Deputy Larned had no idea what plaintiff was wanted for," Br. Opp. 4, ECF 51, that assertion is purely speculative and is not supported by any evidence in the record. In fact, plaintiff's own evidence shows that, shortly after Deputy Larned responded to the Turner Road address, MCSO dispatch informed Deputy Larned that plaintiff "had a Failure to Appear warrant for Assault with 'cautions' for weapons possession." Compl. Ex. A at 7, ECF 6 (MCSO Incident Report); Larned Decl. ¶ 11, ECF 20. A short time later, Salem Police radioed Deputy Larned to inform him that "their department had Probable Cause to arrest [plaintiff] for Assault II." *Id.* at ¶ 13. Plaintiff was convicted of Assault in the Second Degree Constituting Domestic Violence on December 10, 2020. Because assault is a serious and violent felony, this factor supports

defendants' use of force. *See Torres v. Russo*, No. CV1200932PHXROSMEA, 2014 WL 12693865, at *6 (D. Ariz. July 7, 2014), *aff'd sub nom. Torres v. Ray*, 680 F. App'x 541 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396) (noting that the "crime at issue . . . support[ed] that the force used was reasonable" because "felony aggravated assault . . . was a serious offense characterized by violence"); *Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1298 (D. Idaho 2011) (the "severity of the crime" *Graham* factor favored the defendants where there was probable cause to believe the plaintiff had committed aggravated assaulted against a family member).

### 2.        Whether plaintiff posed an immediate threat to officers or others

The next factor considers whether the suspect posed an immediate threat to the safety of the officers or others and also weighs in favor of defendants' use of force. *See Law*, 772 F. Supp 2d at 1298 (deputies reasonably perceived the plaintiff as a threat to officer safety where he was suspected of aggravated assault against a family member, resisted arrest, and may have had access to a gun).

Plaintiff argues that he did not try to harm or threaten defendants, and he relies heavily on the fact that a Marion County jury acquitted him of four charges of assaulting a peace officer. Resp. 2, ECF 38; *see* Glaccum Decl. Ex. B at 30, ECF 19 (verdict form from *State v. McCrae*, No. 20CR50283). That is true, but the same jury also convicted him of resisting arrest, interfering with a police officer, and criminal mischief. *Id.* In light of those facts, and given that plaintiff was wanted on multiple assault charges and could have been armed, the record does not support plaintiff's argument that he was nonthreatening. In fact, plaintiff was uncooperative from the outset by admitting to driving the minivan and giving his real name to Deputy Larned only after "intense questioning." Compl. 3, ECF 2. He immediately escalated the situation by walking

away and out of sight as Deputy Larned told him he had a warrant, and he became

confrontational and aggressive when he questioned the validity of the warrant after he

reappeared. Larned Decl. ¶ 14, ECF 20. The situation became more elevated and dangerous

when plaintiff's initial presence in the house and Deputy Larned's call for canine backup caused

obvious conflict inside and outside of the house with the agitated homeowner. *Id.*; Pl.'s Decl. ¶

18, ECF 50.

      After plaintiff had injured Deputy Larned's wrist and reemerged from the house, he

continued to behave in a dangerous and unpredictable manner by refusing to halt his advance

toward Deputy Larned despite Deputy Larned ordering him to stop. He also threatened Deputy

Larned's safety by continuing his efforts to open the door to the minivan—where he could have

had access to dangerous or deadly weapons—despite Deputy Larned issuing multiple warning

and commands, pointing his gun directly at plaintiff, and warning him, "I will shoot you." *Id.*

When plaintiff turned away from the minivan and started "a quick movement" back toward the

house, the safety issues then became acute because there were innocent bystanders in the house

and there was the potential for plaintiff to barricade himself inside or access weapons. At this

point in time, Deputy Larned deployed his taser against plaintiff's lower back. While plaintiff

argues that he was not threatening anyone at that moment and says he had his arms raised in the

air, there is no dispute that he was about to re-enter a residence in direct defiance of a highly

agitated homeowner who had just ejected him, and it was still not clear whether plaintiff was

armed.

      The situation did not improve during plaintiff's struggle on the ground with deputies.

While Deputy Larned struggled to gain control of plaintiff's wrist and arms, he advised deputies

multiple times that plaintiff had not been patted down for weapons. Compl. Ex. A at 2, ECF 6.

Deputies were also "fighting to get ahold of his limbs" and were also giving plaintiff repeated commands to stop resisting arrest and to place his arms behind his back. Pl.'s Decl. at 8, ECF 50. Plaintiff attests that he "struggled to break free," *id.*, and tried "to escape the defendants' grasps in an attempt to flee and avoid being taken into custody." Br. Opp. at 3. It is undisputed that "nobody was able to restrain plaintiff for several minutes." Pl.'s Decl. at 8, ECF 50. Plaintiff does not dispute that his struggle with defendants left each of them with minor cuts and bruises. *See* Compl. Ex. A at 2, ECF 6.

Given this evidence, it is clear that plaintiff created a dangerous situation that posed a threat to officer safety; this factor therefore supports defendants' use of force against plaintiff. *See Fidge v. Lake Cnty. Sheriff's Dep't*, No. 13-CV-05182-YGR, 2015 WL 3919819, at *11 (N.D. Cal. June 25, 2015), *aff'd* 683 F. App'x 605 (9th Cir. 2017) (finding that the plaintiff, who may have been carrying concealed weapons, created a dangerous situation and threatened officer safety when he taunted the officer and "escalated the situation" further by repeatedly refusing to comply with any of the officer's commands).

### 3.    Resisting arrest or attempting escape

As discussed in part above, there is no genuine dispute that plaintiff both resisted arrest and attempted to flee from defendants throughout his encounter with them. Plaintiff was charged with and convicted of resisting arrest, a misdemeanor under ORS § 162.315[5] based on his physical struggles with defendants and attempts to flee as they tried to take him into custody. *See*

---

[5] Section 315 provides: "A person commits the crime of resisting arrest if the person intentionally resists a person known by the person to be a peace officer or parole and probation officer in making an arrest." "Resists" is defined as "the use or threatened use of violence, physical force or any other means that creates a substantial risk of physical injury to any person and includes, but is not limited to, behavior clearly intended to prevent being taken into custody by overcoming the actions of the arresting officer." OR. REV. STAT. § 162.315(2)(a, c).

Glaccum Decl. Ex. B at 30, ECF 19 (verdict form from *State v. McCrae*, No. 20CR50283). While it is not clear which exact actions on the part of plaintiff the jury had in mind when it found him guilty of resisting arrest, the definition of "resistance" under ORS § 162.315 makes it clear that plaintiff, at a minimum, resisted arrest by pulling away from Deputy Larned and entering the home, by ignoring Deputy Larned's commands, and by physically struggling with defendants to prevent them from handcuffing him. All actions were "behavior clearly intended to prevent being taken into custody by overcoming the actions of the arresting officer," and therefore constituted resistance. *See* OR. REV. STAT. § 162.315(2)(a, c). There is no genuine dispute that plaintiff resisted arrest and did so prior to and concurrently with defendants' use of force. *See Wagoner v. City of Portland*, No. 3:14-CV-2063-AC, 2017 WL 2369399, at *9 (D. Or. May 31, 2017) (under ORS § 162.315, where the evidence shows that the suspect was "kicking, twisting her torso, and pulling her arms against her torso to avoid being handcuffed," the record "does not allow a reasonable dispute of fact regarding [plaintiff's] . . . resistance to being arrested"). Additionally, plaintiff concedes that he refused to be handcuffed because he was "attempting to flee and/or avoid being taken into custody." Br. Opp. at 3, ECF 51; *id.* at 2 (arguing further that he "attempted to flee by running into the resident home" when Deputy Larned tried to arrest him). Plaintiff's admission strengthens the government's interest in the use of force. In light of plaintiff's conviction for resisting arrest and his admitted and extensive efforts to flee defendants, this element clearly favors defendants.

In sum, each of "these *Graham* factors support the conclusion that the government's interest in using force was substantial." *Torres*, 2014 WL 12693865, at *6.

### 4.    The availability of alternative methods

Regarding the alternative-methods factor, whether officers issued a warning before using force or tried less intrusive methods to effectuate an arrest is an important consideration. *See Young*, 655 F.3d at 1165 (noting the alternative-methods factor and finding that the officer "could have warned [the suspect] that he would be placed under arrest if he did not comply with the order . . . that disobedience would lead [the officer] to use force against him; he could have simply begun to effect [the] arrest by attempting to handcuff him; or he could have called for assistance"). Here, Deputy Larned gave repeated commands to plaintiff at various points to stop, turn around, lie down, and stop resisting arrest—among others, and Deputy Larned warned plaintiff that force would be used against him if he did not comply with orders. Larned Decl. ¶¶ 19-25, ECF 20. When plaintiff ignored Deputy Larned's initial commands regarding his outstanding warrants, Deputy Larned called for backup assistance instead of pursuing plaintiff behind the house. *Id.* at ¶ 12. Deputy Larned also tried to handcuff plaintiff only after he disregarded the deputy's multiple commands to not enter the house and that he was under arrest. *Id.* at ¶¶ 15-16. When Deputy Larned was unable to handcuff plaintiff, he released his grip on plaintiff's wrist, remained outside the house, and called for additional backup a second time. *Id.* at ¶¶ 16-17. Finally, after warning plaintiff that he would shoot him as plaintiff attempted to enter the minivan, Deputy Larned holstered his handgun once plaintiff turned away from the van, and used his taser, non-lethal force, instead. *Id.* at ¶ 21. This evidence clearly indicates that Deputy Larned did not use force impulsively and that he tried many less intrusive forms of detaining and arresting plaintiff before resorting to physical force. This factor therefore supports defendants' use of force. *Cf. Young*, 655 F.3d at 1165-1166 (finding the government had "limited" interest in the use of "significant force" where the officer "had a variety of less intrusive options at his disposal" that were "less painful and potentially less injurious").

**C.      The necessity for the force used**

Last, the court must "balance the force used against the need for such force to determine whether the force used was 'greater than reasonable under the circumstances.'" *Id.* (citing *Espinosa v. City and Cnty. of S.F.,* 598 F.3d 528, 537 (9th Cir 2010)). This determination is judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396-97. Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the plaintiff, the court concludes that the officers' use of force was objectively reasonable. *Id.* at 397.

In the circumstances of this case, defendants' use of force to arrest plaintiff was reasonably proportionate to the tense, uncertain, and dangerous situation that Deputy Larned, Deputy Diehl, and Deputy Cheremnov faced. As the Supreme Court remarked in *Graham*, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S., at 22–27). Here, defendants' efforts to place plaintiff under arrest on the assault warrants, among other charges, necessitated some use of force because plaintiff made extensive efforts to flee and resist arrest, he may have been armed, and his sudden and evasive actions created a dangerous situation for the deputies, the occupants of the house, and plaintiff himself. *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding that the defendant had a "reasonable need for some use of force" against the arrestee who was "hostile, belligerent, and uncooperative" and who "paced in agitation and refused to comply with [the officer's] commands"); *cf. Bryan*, 630 F.3d at 831 (finding "no immediate need to subdue [the suspect]" with a taser where he was "was neither a flight risk, a dangerous felon, nor an immediate threat").

Plaintiff argues that a genuine question exists as to whether Deputy Larned "punched him several times . . . in an effort to cause harm," but there is no evidence that Deputy Larned or any defendant had an improper purpose to harm. Moreover, Deputy Larned's "subjective intent in using force against Plaintiff is irrelevant." *Moore v. City of Boise*, 2018 WL 1474060, at *16 (citing *Graham*, 490 U.S. at 397 (holding that the reasonableness inquiry does not include consideration of officers' "underlying intent or motivation")).

Further, this was a situation in which plaintiff's "own actions extended and escalated the situation" and did not involve "the officers provok[ing] a confrontation[.]" *Torres*, 2014 WL 12693865, at *7 (citing *Scott v. Harris*, 550 U.S. 372, 373 (2007) (holding that when balancing the use of force against a government interest in using force, it is appropriate to consider the "relative culpability" of the parties, including which party was responsible for escalating the situation)). This was also a situation in which defendants used significant forms of force to subdue plaintiff—a taser, closed fists, and body weight—but only after a number of less intrusive means proved ineffective and after plaintiff had disregarded Deputy Larned's many commands and warnings for an extended period of time. Moreover, plaintiff has not claimed any injuries from defendants' use of force, and the record contains no evidence that plaintiff was negatively impacted beyond the transitory pain and distress he describes.

In sum, looking at the record in the light most favorable to plaintiff, and also viewing the situation from the perspective of a reasonable officer on the scene, plaintiff's claims cannot survive summary judgment because he resisted arrest on serious charges in a dangerous manner that necessitated force, and defendants used no more force than was necessary to arrest him. *See M.A.R. v. City of Los Angeles*, No. CV 21-2957JFW(MARX), 2022 WL 2167453, at *1 (C.D. Cal. Mar. 28, 2022) (granting defendants summary judgment on excessive force claim where

they used "the amount of force necessary and reasonable in order to handcuff [the arrestee], who was actively resisting the [defendants'] efforts to take him into custody"). In other words, no reasonable jury could conclude that defendants' actions were "'objectively unreasonable' in light of the facts and circumstances confronting them.'" *Glenn*, 673 F.3d at 871 (quoting *Graham,* 490 U.S. at 397).

Defendants are therefore entitled to summary judgment on plaintiff's claim of excessive force. *See Tatum v. City and County of San Francisco*, 441 F.3d 1090 (9th Cir. 2006) (granting summary judgment to officers on a claim of excessive force who used a "control hold" but not "crushing pressure" to restrain and arrest a "potentially violent suspect, behaving erratically and resisting arrest," and emphasizing that the suspect "kicked and struggled throughout the officers' efforts to secure him in handcuffs" and that "officers needed to incapacitate [the suspect], both to protect themselves and to protect him"); *see also, Draper*, 369 F.3d at 1278 (holding that the officer's use of a taser did not constitute "excessive force" because it was "reasonably proportionate to the need for force and did not inflict any serious injury").

## II.    Failure to Intervene Claim

Plaintiff also claims that Deputy Cheremnov should have intervened to stop Deputy Larned's excessive use of force when she arrived on the scene and witnessed him delivering one or more punches to plaintiff as they struggled on the ground. Compl. 4, ECF 2. In the Ninth Circuit, courts recognize that "a law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (9th Cir. 1988). However, as discussed above, Deputy Cheremnov had no reason to believe that deputies were violating plaintiff's constitutional rights. According to the intake forms completed by Deputy Cheremnov following

plaintiff's arrest, she arrived on the scene knowing that plaintiff had "confirmed warrants and PC for assault III" and that he had fled into a residence. *See* Compl. Ex. A, ECF 6 (MCSO "Probable Cause Statement & Data Sheet"). She was also present when Deputy Larned advised deputies "multiple times [plaintiff] had not been patted down for weapons" as they struggled to gain control of his arms, and as several officers ordered plaintiff to "stop resisting arrest." *Id.* Deputy Cheremnov even attempted to handcuff plaintiff herself, but was unable to. *Id.* After plaintiff was handcuffed and placed into a deputy's vehicle, Deputy Cheremnov also observed plaintiff continuing to resist arrest by kicking the door of the vehicle hard enough to do serious damage. *Id.*

Because a reasonable jury could not find defendants used excessive force against plaintiff, a reasonable jury could not find that Deputy Cheremnov failed to intervene. *See Moore*, 2018 WL 1474060, at *19 (granting summary judgment to a deputy where there was "no evidence in the record that, in the short time [Officer] Bovard was near Plaintiff, she had any reason to believe that [Officer] Muguira's use of force was objectively unreasonable"). Deputy Chermnov is therefore entitled to summary judgment. *See id.*

**RECOMMENDATION**

For the reasons explained above, defendants' Motion for Summary Judgment (ECF 18) should be GRANTED. The complaint should be dismissed.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the District Court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of this recommendation to file specific written objections with the Court. If an objection is filed, any response to the objection is due

within fourteen (14) days from the date of the objection. *See* Fed. R. Civ. P. 72, 6. The parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this 14th day of July 2022.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

27  -  FINDINGS AND RECOMMENDATION